**Eugenia HARRIS, et al., Respondents,**

v.

**Harold E. NIEHAUS, et al., Appellants.**

No. 75087.

Supreme Court of Missouri,
En Banc.

June 29, 1993.

Rehearing Denied Aug. 17, 1993.

Walter D. McQuie, Jr., Montgomery City, for appellants.

Richard B. Blanke, St. Louis, for respondents.

ROBERTSON, Chief Justice.

This case is about a terrible tragedy. The three minor children of Larry and Eugenia Harris drowned when an automobile in which they had been left unattended rolled down a roadway, through some woods and into a lake. The issue in this case is whether the trustees of the subdivision, who bore responsibility for the maintenance of the roadway, also bear liability for the damages resulting from the deaths of the Harrises' children. A jury returned a verdict for the plaintiffs. The Court of Appeals, Eastern District, affirmed in part and reversed in part and transferred the case to this Court pursuant to Article V, Section 10, Missouri Constitution, because of the general interest and importance of the questions presented in the case. We have jurisdiction and reverse the judgment of the trial court awarding plaintiffs damages in the case and remand for entry of judgment in favor of defendants.

I.

Defendants/appellants are the trustees of the Woodridge Subdivision. Under the trust indenture the trustees bear responsibility for the maintenance of the roads, parks, and common areas of Woodridge Subdivision. Eugenia Harris (Mrs. Harris) is the sole proprietor of C & H Roofing, a small roofing company headquartered in Warrenton, Missouri.

In August, 1986, Mrs. Harris successfully bid a roofing job for a new home along Lakepoint Drive, one of the roadways in Woodridge Subdivision. Lakepoint Drive is a gravel road that descends in increasingly steep gradients to a cul-de-sac. A small lake lies approximately one hundred feet from the end of the roadway. An abandoned boat ramp extends from one point on the cul-de-sac. Lakepoint Drive was constructed, in part, to permit subdivision lot owners and their guests access to the lake.

On September 16, 1986, Mrs. Harris stopped by the contract property to view the progress on the construction and determine when her services would be required. Her three minor children, ages 6, 4 and 3, accompanied her. When she arrived at the job site, Mrs. Harris parked her car on Lakepoint Drive, pointed toward the lake. Trial exhibits show a 6.31 percent grade where Mrs. Harris parked. The lake is clearly visible from that point. The road extends from there approximately 200 feet to the end of the cul-de-sac. The grade increases to 7.99 percent for approximately 90 feet, decreases slightly to 7.00 percent for 50 feet, increases to 9.38 percent for the next 32 feet, and increases to 17.89

percent for the last 11.5 feet of the roadway. The lake lies 98.5 feet from the end of the road; from the end of the road to the lake the grade increases to an average of 26.40 percent through a thinned grove of mature trees and brush.

Mrs. Harris testified that, when she arrived at the construction site, she put the car's automatic transmission in park, removed the keys from the ignition, and left the car with the three children in it. Shortly after entering the unfinished home, Mrs. Harris heard gravel crunching. Running outside, she could not see her car but could hear it moving through the trees and brush toward the lake. Mrs. Harris ran to the end of the road and followed the path of the car to the lake. By the time she got there, she was too late to save her children. All of them drowned.

Mr. and Mrs. Harris, as the statutory designees, filed this wrongful death action against the trustees of the Woodridge Subdivision alleging negligence in their failure to warn of, or protect their children from, the unreasonably dangerous slope of Lakepoint Drive. The trial court submitted the Harrises' claims to the jury. The jury awarded damages in the sum of $375,000, allocating 90 percent of fault to Mrs. Harris and 10 percent of fault to the trustees of the subdivision.

## II.

In a negligence action, liability only exists when a defendant's conduct "falls below the standard [of care] established by law for the protection of others against unreasonable risk of harm," Restatement (Second) of Torts, § 282, and such conduct is the proximate cause of the plaintiffs' injuries. The particular standard of care that society recognizes as applicable under a given set of facts is a question of law for the courts. Whether a defendant's conduct falls short of the standard of care is a question of fact for the jury. The Court will not, however, submit a case to the jury where no evidence exists to support a finding that defendant's conduct fell below the identified standard of care.

### A.

When a plaintiff sues a possessor of land for injuries arising out of an unreasonably dangerous condition on that land, the standard of care owed by the defendant is defined by the relationship existing between the possessor of the land and the plaintiffs. As this is a wrongful death action, the debate in this case centers on the status of the Harris children. Defendants claim that the children were licensees; the Harrises argue that the children assumed Mrs. Harris' status as an invitee. The standard of care owed an invitee is generally higher than that owed a licensee.

A licensee "is a person who is privileged to enter or remain on land only by virtue of the possessor's consent." Restatement (Second) of Torts, § 330 (1965). An invitee "is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." Restatement (Second) of Torts, § 332 (1965).

As a subcontractor who had contracted to provide construction services on the contract home, Mrs. Harris' entry upon the land of the Woodridge Subdivision served not only her business purposes, but the financial interests of the subdivision as well. Thus, it appears that Mrs. Harris was an invitee at the time of the accident. We need not decide whether the Harris children were also invitees or were mere licensees because we believe that the trustees had a right to judgment even under the higher of the two standards of care. We assume, therefore, without deciding, that Mrs. Harris' children were vested with her status as an invitee when they accompanied her to the subdivision.

### B.

When the plaintiff is an invitee, a possessor of land is subject to liability for injuries caused by a condition on the land *only if* the possessor

    (a) knows or by the exercise of reasonable care would discover the condition,

and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts, § 343 (1965). Thus, to meet the applicable standard of care a possessor of land must (1) exercise reasonable care; (2) disclose to the invitee all dangerous conditions which are known to the possessor and are likely not to be discovered by the invitee; and (3) see that the premises are safe for the reception of a visitor, or at least ascertain the condition of the land, to give such warning that the invitee may decide intelligently whether or not to accept the invitation, or may protect himself against the danger if he does accept it. Restatement (Second) of Torts, § 343, Comment b.

▪ Under the second element of § 343, when the dangerous condition is so open and obvious that the invitee should reasonably be expected to discover it and realize the danger, a possessor of land does *not* breach the standard of care owed to invitees "unless the possessor should anticipate the harm despite such knowledge or obviousness." Restatement (Second) of Torts, § 343A(1) (1965). This element acknowledges that a possessor of land is not an absolute insurer of the well-being of its invitees. As a general matter, therefore, a possessor's actions do not fall below the applicable standard of care if the possessor fails to protect invitees against conditions that are open and obvious as a matter of law. We adopt §§ 343 and 343A(1) as accurate statements of the law of Missouri.

The Harrises claim that (1) the trustees knew or should have known that the slope of Lakepoint Drive posed an unreasonable risk of harm to users of that road, (2) the trustees should have expected that neither Mrs. Harris nor her children would realize the danger or be able to protect themselves from it, and (3) the trustees failed to use ordinary care to protect them by either (a)

warning of the slope or (b) barricading the end of the cul-de-sac.

The Harrises presented a submissible case on the first element of § 343. The slope of the road and the position of the lake were either actually or constructively apparent to the trustees. Whether this condition is "unreasonably dangerous" is subject to reasonable dispute and is reserved for the jury's consideration.

▪ The Harrises' case fails, however, on the second element of § 343. We hold as a matter of law that the natural condition present on Lakepoint Drive in the Woodridge Subdivision was open and obvious to all who would encounter it. The pictures of the scene of the accident, surveys of the scene, testimony by experts who had examined the scene, and Mrs. Harris' own recollection of the scene all inarguably reveal the degree of danger that was present. The lake is plainly visible from the parking place Mrs. Harris chose. The road obviously slopes down toward the lake, and the only visible barriers between the road and the lake are natural ones—a substantial number of trees. The distance from the parking place to the lake is less than 300 feet.

▪ The critical question, therefore, is whether the trustees could *reasonably rely* on its invitees to protect themselves from this danger or whether the trustees *should have expected* that drivers and occupants of cars using Lakepoint Drive would not appreciate the danger or would be unable to keep their cars from careening into the lake. The trustees are entitled to expect that their invitees will exercise ordinary perception, intelligence and judgment, discover this obvious condition, appreciate the risk it presented, and take the minimal steps necessary to avert a tragedy.

▪ The evidence—and, more importantly, common sense—conclusively support as reasonable the trustees' reliance on their invitees to take the simple steps necessary to protect themselves. The trustees maintain the roads in the subdivision and, in so doing, must anticipate that their invitees will use those roads when conducting

business within the subdivision. Regardless of whether the invitees are children or adults, however, the trustees could reasonably anticipate that any person operating a vehicle on the subdivision's roads (1) will be licensed to drive, (2) will possess the minimal amount of skill necessary to operate the vehicle safely, and (3) will have acquired sufficient life experience to know that automobiles will roll downhill and should not be driven into lakes. The defendants could also reasonably anticipate that anyone intending to leave children unattended in a vehicle parked along Lakepoint Drive will take effective measures to ensure that the car is secured from the operation of the laws of gravity.

On the facts of this case, we hold that the trustees could reasonably rely on their invitees to see and appreciate the risk presented by the slope of Lakepoint Drive and the location of the lake, clearly visible from Mrs. Harris' parking spot. We further hold that the trustees could reasonably rely on anyone driving a car in the subdivision to employ the simple means at their disposal to prevent this harm from occurring. These measures, if taken, would not only protect an invitee/driver but would also protect any invitee/child who might be left unattended in a car in the subdivision.

■ The natural condition on Lakepoint Drive is open and obvious as a matter of law. Because the trustees could reasonably rely on the invitee's normal sensibilities to protect against such a condition, the trustees' failure affirmatively to protect Mrs. Harris and her children against such a condition does not fall below the standard of care applicable in this case. The Harrises have offered no evidence to the contrary. This case should not have been submitted to the jury.

### C.

Mrs. Harris argues that even if the danger was "open and obvious," this Court's decision in *Cox v. J.C. Penney Company*, 741 S.W.2d 28 (Mo. banc 1987), removed the issue of the plaintiff's knowledge of an obviously dangerous condition as a element of the plaintiff's cause of action.

*Cox* was a business invitee case. Mrs. Cox tripped over a luggage strap she claimed extended across a pedestrian aisle in a department store injuring her wrist. At the time of trial, MAI 22.03 required the jury to find as a second element "that plaintiff did not know and by using ordinary care could not have known of this condition." Mrs. Cox offered an instruction deleting this element of the tort. The trial court refused Mrs. Cox' proposed instruction and submitted the case to the jury using MAI 22.03 along with an instruction telling the jury to assess a percentage of fault to Mrs. Cox if it reached a verdict in her favor. The jury returned a verdict for J.C. Penney.

On appeal, Mrs. Cox argued that comparative fault abrogated the time-honored requirement that a plaintiff show that she did not know and by using ordinary care could not have known of an unsafe condition on the property. This Court reasoned that the adoption of comparative fault placed in juries the requirement to assess the relative fault of the parties in tort actions and concluded that the second element of MAI 22.03 "pretermits jury assessment of respondent's fault for failure to maintain the premises in a reasonably safe condition." *Id.* at 30.

■ A more crisp analysis in *Cox* would have pointed out that the second element of the instruction—that "plaintiff did not know and by the exercise of ordinary care could not have known of this condition"— hopelessly intermingles questions about the condition of the property with the plaintiff's responsibility to keep a careful lookout. *Cox* did not intend to abrogate the open and obviousness of a condition as a consideration for the court in determining a possessor of land's standard of care. Quite simply, where the danger is open and obvious as a matter of law and the risk of harm exists only if the plaintiff fails to exercise due care, the case is not submissible to the jury—and the dilemma resolved in *Cox* is never reached.

### III.

As we have previously said, the evidence in this case leads inescapably to the conclu-

sion that the dangerous condition of the land was open and obvious to anyone on the premises. Because the plaintiffs offer no reason why the trustees should have expected that a driver of a car on Lakepoint Drive would be unable to protect herself or her invitees/passengers from ending up in the lake, the trustees cannot be said to have breached their standard of care. Given their reasonable reliance on the invitees to protect themselves, we hold that the trustees were under no obligation to take additional steps to protect these plaintiffs.

The judgment of the trial court is reversed and the cause remanded for entry of judgment in favor of the defendant trustees.

COVINGTON, HOLSTEIN, THOMAS and LIMBAUGH, JJ., concur.

BENTON, J., concurs in part and dissents in part in separate opinion filed.

PRICE, J., concurs in opinion of BENTON, J.

BENTON, Judge, concurring in the result in part and dissenting in part.

The principal opinion finds that this case should not have been submitted to the jury under either a failure-to-warn or a failure-to-protect theory. As to failure-to-warn, this holding is eminently correct because no evidence suggests that the trustees could have warned either the mother or children in a way that would give additional information. *Arnold v. Ingersoll–Rand Co.*, 834 S.W.2d 192, 194 (Mo. banc 1992).

As for the submissibility of the failure-to-protect claim, there is no question that the plaintiffs introduced sufficient evidence of but-for causation. The principal opinion holds that, from the trustees' view, the mother's negligence was not foreseeable, "expected," or "anticipated," and that the trustees should have neither expected nor anticipated such an accident.

I disagree. In reviewing the sufficiency of a claim, this Court takes the evidence in the light most favorable to the party submitting the claim, and makes all reasonable inferences in support of that party. *Ol-*

*daker v. Peters*, 817 S.W.2d 245, 251–52 (Mo. banc 1991); *Delisi v. St. Luke's Episcopal—Presbyterian Hospital, Inc.*, 701 S.W.2d 170, 173 (Mo.App.1985). In this light, the evidence demonstrates that this accident was foreseeable.

## I. Facts

The road in question was built on a hill and sloped toward a lake. The slope was sufficiently gentle to guarantee that people would park on the road, and the trustees knew that people regularly parked on this road, and around the cul-de-sac. The principal opinion's focus on driving is off-the-point; this is a parking case. While placing a car in "park" and taking other routine precautions will normally prevent a car from rolling down a hill, a jury could infer—as this one did—that a reasonable trustee would foresee the possibility of a mechanical malfunction or other human error that would cause a car to roll down the hill.

The principal opinion argues that it was not foreseeable that a parent would leave children alone in the car. In reality, parents often do leave children alone in cars for brief intervals, often without the slightest thought. From the evidence in this case, a jury could reasonably infer that Eugenia's behavior fit into this typical circumstance of a parent believing that he or she would be away only for a minute or two, and that the children were safer being left in the car, than going on the construction site. Eugenia is also typical in that she believed that taking the keys with her prevented the car from rolling.

## II. Foreseeability

These facts sufficiently demonstrate foreseeability. In most areas of tort law, the negligence of another eliminates liability for one's own negligence *only if* the negligence of the other person was not reasonably foreseeable. *See, e.g., Jordan v. General Growth Development Corp.*, 675 S.W.2d 901, 903–04 (Mo.App.1984); Restatement (Second) of Torts, § 447; *see also Leveillee v. Wright*, 300 Mass. 382, 15

N.E.2d 247, 251 (1938) ("It was not necessary that the defendant should have foreseen the precise manner in which the accident might result.... We think that it could have been found that in its general nature, what actually occurred was a probable consequence of the defendant's negligence."); *Berry v. Visser*, 354 Mich. 38, 92 N.W.2d 1, 5 (1958); Restatement (Second) of Torts, § 302A cmt. c ("[T]he actor is required to know that there is a certain amount of negligence in the world, and that some human beings will fail on occasion to behave as a reasonable [person] would behave.") Thus, in a comparative fault system, negligence by a plaintiff should eliminate liability—as opposed to reducing recovery—only if that negligence were not reasonably foreseeable. Restatement (Second) of Torts, § 302A cmt. b.

Reasonable foreseeability does not require that the defendant be able to foresee the precise details of the accident. Instead, the question is whether that type of accident was foreseeable. "The test is not whether a reasonably prudent person would have foreseen the particular injury, but whether, after the occurrences, the injury appears to be the reasonable and probable consequence of the act or omission of the defendant." *Foley v. Hudson*, 432 S.W.2d 205, 207 (Mo.1968). "[Defendant] may not have anticipated that the occurrences would happen exactly as they did, but that is not necessary. It is sufficient that what occurred is a natural or probable consequence of his act ... and that some injury was reasonably foreseeable." *Id.* at 208. "If the result is foreseeable, the manner in which it is brought about need not be, and is immaterial." *St. John Bank & Trust Co. v. City of St. John*, 679 S.W.2d 399, 403 (Mo.App.1984), *quoting* Prosser & Keeton, Torts § 44, at 317 (5th ed. 1984).

While it is true that the evidence supported the submission of Eugenia's fault to the jury—and the jury found Eugenia to be 90% at fault—the principal opinion emphasizes Eugenia's fault in order to eliminate the trustees' liability. Because the possibility of a runaway car was reasonably foreseeable, Eugenia's fault is a concurrent cause, not an intervening cause, of the damages.

### III.   Contributory Negligence

The principal opinion bases its finding of no liability on its interpretation of § 343(b) as explained by § 343A(1) of the Restatement (Second) of Torts. These sections allow recovery, even though a condition may be open and obvious if the landowner should still "anticipate" harm. Since these sections were written in terms of contributory negligence, they partake equally of the logic of assumption-of-the-risk/contributory-negligence and of the logic of intervening cause.

As *Cox v. J.C. Penney Co.*, 741 S.W.2d 28, 29–30 (Mo. banc 1987), recognized, it would be improper under a comparative fault system to excuse a landowner's liability for all types of negligence by a plaintiff. Such reasoning is especially true in a case of wrongful death because, traditionally, the negligence of one member of the class of beneficiaries is not imputed to the other members of that class. *Sanfilippo v. Bolle*, 432 S.W.2d 232, 233–34 (Mo.1968).

Under a comparative fault system, § 343(b) only requires determining whether the landowner should have anticipated the negligent act—*i.e.*, was the act foreseeable. Section 343 does not permit a possessor of land to expect that invitees will never be negligent. In other words, the issue is properly one of proximate causation. When there is disputed evidence—as in this case—on whether the landowner had reason to expect this type of accident, liability is a mixed question of law and fact; thus, the case properly belongs to the jury.

In describing the types of acts which owners need not anticipate, the principal opinion says that owners can rely on invitees using "due care" and "ordinary perception, intelligence, and judgement." While I do not believe that the principal opinion intends to reimpose contributory negligence for cases involving invitees and premises liability, some trial judges and lawyers could easily read such a standard into the principal opinion. This choice of terms by the principal opinion is unfortu-

nate because I believe that the only real difference between this opinion and the principal opinion is a disagreement over the sufficiency of the evidence, and not over the law that applies to the case.

### IV.

Because the failure-to-warn theory was not submissible, I would reverse and remand for a new trial only on the failure-to-protect claim. *Miller v. Scholl,* 594 S.W.2d 324, 328 (Mo.App.1980). For this reason, I concur in the result in part and dissent in part.